IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FRANK HELM, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> MICHAEL J. ASTRUE, Commissioner ) <br> of Social Security, ) <br> ) <br> Defendant. ) | No. 07 C 2585 <br><br> Magistrate Judge Schenkier |

## MEMORANDUM OPINION AND ORDER

This case involves an appeal from the Social Security Administration by plaintiff, Frank Helm, after a denial by the Commissioner of Social Security ("Commissioner") of Mr. Helm's June 18, 2004 application for Supplemental Security Income ("SSI"). In his application, Mr. Helm claimed the disabilities of diabetes, arthritis, sleep apnea, neuropathy, foot problems and high blood pressure (R. 28). Mr. Helm claims an onset of disability date of September 15, 2003 (R. 74). An Administrative Law Judge ("ALJ") denied his application for benefits on July 28, 2006 (R. 12). The Appeals Council also denied Mr. Helm's application on March 12, 2007 (R. 5), making the ALJ's opinion the final decision of the Commissioner. This appeal followed. For the reasons stated below, the Court grants Mr. Helm's motion for remand (doc. # 20) and denies the Commissioner's motion for affirmance (doc. # 22).

I.

We begin with a brief review of the legal standards. In order to establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant must demonstrate that his impairments prevent him from performing not only his past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A).

The social security regulations prescribe a sequential five-step test for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4); *see also Young v. Sec'y of Health and Human Serv.*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. *See* 20 C.F.R. § 404.1520(a)(4). A negative answer at any step other than Step 3 precludes a finding of disability. *Young*, 957 F.2d at 389. The claimant bears the burden of proof at Steps 1 through 4, after which the burden shifts to the Commissioner at Step 5. *Id.* In cases of severe impairment, the ALJ's analysis at Step 4 typically involves an evaluation of the claimant's residual functional capacity ("RFC") to perform past relevant work. *See* 20 C.F.R. § 404.1520(e). If a person can still do this type of work, the Commissioner will find that the person is not disabled. *Id.*

The Step 5 analysis involves an evaluation of the claimant's RFC to perform any work other than past relevant work in the national economy. *See Bowen v. Yuckert*, 482 U.S. 137, 142 (1987);

20 C.F.R. § 1520(g)(1). At Step 5 the government carries the burden of "providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do given [his] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). Although the burden at this step shifts to the government to produce evidence regarding work opportunities, the government is not responsible to produce any evidence regarding the claimant's residual functional capacity. 20 C.F.R. § 404.1560(c)(2). This is because the same residual functional capacity used at Step 4, for which the claimant carries the burden of proof, is applied at step five. 20 C.F.R. § 404.1560(c)(2). If a person with the claimant's RFC can still find jobs in the national economy, the Commissioner will find the person not disabled. 20 C.F.R. § 404.1520(g)(1).

In reviewing the ALJ's decision, this Court may not decide facts anew, reweigh evidence or substitute its own judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact that are supported by "substantial evidence." 42 U.S.C. § 405(g) (2002). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dray v. R.R. Retirement Bd.*, 10 F.3d 1306, 1310 (7th Cir. 1993) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). When conflicting evidence allows reasonable minds to differ, the responsibility for determining whether the claimant is disabled falls upon the Commissioner (and by extension the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final

decision is supported by substantial evidence and based upon proper legal criteria. *Delgado v. Bowen*, 782 F.2d 79, 81 (7th Cir. 1986) (per curiam).

However, the ALJ is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not elect to discuss only the evidence that favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id.*; *see also Young*, 957 F.2d at 393 (the ALJ must articulate a reason for rejecting evidence "within reasonable limits" if there is to be a meaningful appellate review). The written decision must provide a "logical bridge from the evidence to the conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

## II.

The following facts are taken from the record and are material to the disability decision we are reviewing. We begin with general background and then move to the medical evidence and the facts found by the ALJ in his opinion denying benefits.

### A.

Frank Helm was born on February 26, 1961 (R. 74). Mr. Helm is single and has never been married (R. 300). Mr. Helm is six feet two and a half inches tall and weighs 295 pounds (R. 150).

4

Mr. Helm and his eighty-one year old mother live together in the same home (R. 300). Mr. Helm's mother has diabetes and Crohn's disease (R. 301, 315). Because of her illnesses, Mr. Helm sometimes must assist her (R. 301). His tasks around the house include cooking (R. 301), taking care of the cat, doing the laundry and grocery shopping (R. 304). Mr. Helm graduated from high school (R. 301). He took a few classes at Harper College while working there, but he has no college degree (R. 301).

Mr. Helm last worked on September 15, 2003 (R. 302). For roughly six years prior to September 15, 2003, Mr. Helm worked for Harper College managing the soda vending machines on the campus (R. 302-03). His responsibilities included cleaning, filling, collecting money from, fixing and maintaining stock in thirty-five vending machines around campus (R. 302). Mr. Helm claims that shortly prior to leaving this job the fatigue he experienced while working caused him to take breaks after servicing just one machine (R. 324).

Prior to working at Harper College, Mr. Helm worked at the 7ELEVEN FOOD STORES as an assistant manager (R. 303). Mr. Helm worked under three different owners and mainly worked the night shift (R. 303). As an assistant manager, Mr. Helm's responsibilities included ordering, coordinating work with field representatives in the area, and maintenance work (R. 303). Mr. Helm could not hire or fire workers, but he could make personnel recommendations (R. 303). Mr. Helm had minimal formal training for this job; he acquired all these skills while on the job (R. 303-4).

Since he stopped working outside his home in 2003, Mr. Helm's daily routine has become less active. Mr. Helm's normal day now consists of watching television, cleaning the cat pan, preparing meals and doing other household tasks such as laundry or grocery shopping (R. 304). Mr. Helm spends some time on the computer, but he says that it can be difficult for him because his

5

hands do not do what he wants them to do (R. 304). Mr. Helm gave the following example of his difficulty in using his hands due to numbness:

> [I]f I am taking silverware out of, out of a drawer, if there's just one fork in there, then I have no problem picking up that one fork. But if there's, but you got a bunch of forks in the same area there, I have a hard time manipulating through them.

(R. 317). The ALJ re-examined Mr. Helm as to the cause of these problems with his hands, but Mr. Helm was unable to provide a clear explanation of the cause of his hand problems (R. 317-18). Mr. Helm testified that he has spoken to his doctor about these problems but, because determining the exact cause requires testing that he cannot afford, his doctor has not performed the appropriate tests (R. 315). On questioning from his own attorney, Mr. Helm attributed his problems with fine manipulations to the numbness in his fingers (R. 318). Mr. Helm reports difficulty in using his hands to get what he needs out of a drawer and getting lids back on jars (R. 87; *see also* R. 104). Mr. Helm stated that he does not read often because it makes him fall asleep (R. 304-305). He also stated that he sometimes struggles to find a position to stay in that does not cause him pain (R. 304).

Mr. Helm claims that due to his medical problems, pain and his fatigue interfere with his current daily life the most (R. 305). Mr. Helm reported pain and swelling in his legs, dizziness when standing for long periods of time, and needing to take breaks after periods of work such as shopping or moving furniture around his bedroom (R. 87-88; *see also* R. 104). Mr. Helm says he feels pain throughout his body, but primarily in his legs, feet and back, with the pain in his feet being constant (R. 305-309). Mr. Helm said that several times a day he experiences shooting pain that begins in the spine and then shoots down his left leg to the calf (R. 305). On a scale from one to ten, Mr. Helm rates the pain at a nine and claims that if he did not sit down or change positions the pain would be

at a level of a ten (R. 307) Mr. Helm indicated that lying flat on his back causes him the least amount of pain (R. 312). He also claims that his feet constantly hurt (R. 305). In addition to generalized pain in his feet, sometimes his left foot goes numb and "floppy," causing him to be unable to move it for five or ten minutes (R. 305-06).

Mr. Helm claims that due to pain and cramping in his back and legs he cannot remain in one position for extended periods of time, and he sometimes has problems walking or standing (R. 305-311). Although he has tried a number of pain medications, including Advil and Celebrex, he testified that no pain medications alleviate his pain or cramping (R. 308). With regard to his ability to stand for any length of time, Mr. Helm testified: "If I have to wait, stand in line . . . , I would probably fall over if I didn't have the cane to balance me out" (R. 310). On examination by his attorney, Mr. Helm described how he walks slowly and with his legs as far apart as possible to control his balance (R. 312). He also discussed how he has particular difficulty with walking on uneven surfaces, stating that walking on a ramp is "like the bottom is dropping out" (R. 313). Mr. Helm uses a cane to help him get around (R. 311), and when at home, holds on to furniture and counters for support (R. 105). Mr. Helm's doctor did not prescribe the cane, but they told him it was a good idea for him to use one (R. 310). However, even with the cane, he still can only walk a block or two before he must sit down and take a break due to dizziness (R. 311).

### B.

Mr. Helm applied for SSI on June 18, 2004, claiming an onset date of September 15, 2003 (R. 28). Mr. Helm claimed disability due to diabetes mellitus, high blood pressure, neuropathy, sleep apnea, arthritis and foot problems (R. 122).

Dr. Soofi, Mr. Helm's doctor through the Access to Care Program, first diagnosed Mr. Helm with diabetes in early 1988 (R. 187). Approximately three years later, Mr. Helm's diabetes began affecting his joints and motor skills. On January 15, 2001, Mr. Helm had an electromyogram[1] (EMG) study conducted by Dr. Svetic, a neurologist, because of persistent "mild to moderate headaches localized mainly on the left side below and above the left eye, sometimes spreading to the temporal area" (R. 224-26). The EMG study showed results consistent with "chronic, moderate sensory motor polyneuropathy,[2] predominantly axonal and mild right ulnar mononeuropathy[3] which is unlocalized" (R. 224-26). On March 1, 2003, Mr. Helm saw Dr. Birnbaum, his primary treating doctor, because of problems with his left foot (R. 123). Dr. Birnbaum diagnosed Mr. Helm with cellulitus[4] of the left foot with an open wound with complications (R. 123). On April 7, 2003, Dr. Margaret Boyle saw Mr. Helm to conduct an MRI of his left foot. Dr. Boyle diagnosed Mr. Helm with cellulitus of the left foot, osteomyelitis[5] on the third toe of the left foot and extensive bone damage to the third toe on the left foot (R. 125). Although there is no paperwork in the record from

---

[1] "An electromyogram measures the electrical activity of muscles at rest and during contraction . . . An electromyogram is done to find diseases that damage muscle tissue, nerves or other junctions between nerves and muscles . . . find the cause of weakness, paralysis or muscle twitch." *WebMD*, http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies (visited April 3, 2008).

[2] Sensorimotor polyneuropathy is a body-wide (systemic) process that damages nerve cells, nerve fibers (axons), and nerve coverings (myelin sheath). Damage to the covering of the nerve cell causes nerve signals to slow down. Damage to the nerve fiber or entire nerve cell can make the nerve stop working. MEDLINE PLUS ENCYCLOPEDIA, *Sensorimotor Polyneuropathy*, http://www.nlm.nih.gov/medlineplus/ency/article/000750.htm (visited April 3, 2008).

[3] Mononeuropathy is damage to a single nerve or nerve group, which results in loss of movement or sensation. MEDLINE PLUS ENCYCLOPEDIA, *Mononeuropathy*, http://www.nlm.nih.gov/medlineplus/ency/article/00780.htm (visited April 3, 2008).

[4] Cellulitis is an acute inflammation of the connective tissue of the skin, caused by infection with staphylococcus, streptococcus or other bacteria. MEDLINE PLUS ENCYCLOPEDIA, *Cellulitus*, http://www.nlm.nih.gov/medlineplus/ency/article/000855.htm (visited April 3, 2008).

[5] Osteomyelitis is an acute or chronic bone infection, usually caused by bacteria, MEDLINE PLUS ENCYCLOPEDIA, *Osteomyelitis*, http://www.nlm.nih.gov/medlineplus/ency/article/000437.htm (visited April 2, 2008).

the amputation, it is clear from later doctor reports that this cellulitus and bone damage to the third toe of the left foot led to partial amputation of that toe.[6]

In June and July of 2003, Mr. Helm saw several doctors about fatigue and fluctuating blood pressure. On June 11, 2003, Dr. Venu Reddy wrote a report letter to Dr. Birnbaum stating that Mr. Helm reported increasing fatigue. Dr. Reddy mentioned in this letter that sleep apnea could be a problem causing the fatigue and suggested testing (R. 206). The letter also indicated that, in the past six months, Mr. Helm's blood pressure ranged from 160/100 to 105/60 (R. 206). Mr. Helm's blood pressure on that day was 148/98[7] with a pulse of 89 (R. 206). Dr. Reddy performed a rest/stress exercise myocardial perfusion report on June 23, 2003 (R. 216). On that day, Mr. Helm's blood pressure was 124/90 at rest and 200/90 at peak exercise (R. 216). The test showed a normal stress perfusion study with normal left ventricle function and motion but a hypertensive blood pressure response to exercise (R. 216).

On June 13, 2003, Dr. Daniel So, a specialist in endocrinology and diabetes wrote a letter to Dr. Birnbaum stating that he saw Mr. Helm regarding his fluctuating blood pressure upon Dr. Birnbaum's referral (R. 139). Dr. So indicated that he was going to run tests to determine the cause of the fluctuating blood pressure (R. 139). In that letter, Dr. So stated that Mr. Helm's diabetes was under good control and that his blood pressure on that day was 140/85. Dr. So further stated that,

---

[6]Dr. Birnbaum notes in a medical report dated November 9, 2004, "amputation [left] third toe" under the Musculosketal System section of the report (R. 146A); Dr. Shaikh noted in his exam report dated July 22, 2004, "partial amputation of the 3rd toe" (R. 149); Dr. Runke made a note in his report dated August 4, 2004 that appears to read, "½ amputa[tion of] l[eft] 3d toe." (R. 160); Mr. Helm testified at the hearing that his left third toe was partially amputated (R. 320).

[7]Normal blood pressure is less than 120/80. *WebMD*, http://www.webmd.com/hypertension-high-blood-pressure/guide/blood-pressure-basics (visited April 3, 2008).

in an examination of Mr. Helm's extremities, he found no edema[8] and no tremor in the upper extremities (R. 140). On July 3, 2003, Dr. So reported that, based on the tests, Mr. Helm's fluctuating blood pressure is probably not due to endocrinopathy but might be autonomic dysfunction from the underlying diabetes (R. 138).

On August 8, 2003, Dr. Birnbaum wrote a letter to Mr. Helm's employer stating that Mr. Helm would need to miss one to two days of work per week because of his medical condition (R. 108). On August 16, 2003, Harper College terminated Mr. Helm's employment (R. 109). Mr. Helm's termination slip cites "gross misconduct" as the reasons for his termination (R. 109). Mr. Helm testified that the gross misconduct was storing money in a closet (R. 322). However, Mr. Helm claims that the "closet" was a locked storage room to which only the supervisor and the campus police have keys (R. 323). Mr. Helm claims that his employer was looking for a reason to fire him because he had been missing so much work due to his medical problems (R. 323).

On July 22, 2004, Mr. Helm saw Dr. Shaikh for a forty-five minute consultative examination for the Bureau of Disability Determination Services (R. 149). In that exam, Dr. Shaikh reported that Mr. Helm has diabetes mellitus with a history of neuropathy (R. 151). Mr. Helm has recurrent infections in his toes and non-healing scabs on his feet, poor pulses in his lower extremities, and likely suffers from some degenerative joint disease in the knees (R. 151). However, Dr. Shaikh reported that Mr. Helm does not appear to have decreased sensation in his hands and feet, and that his "gait and ability to bear weight is normal" (R. 151).

---

[8]Edema is an alternative name for swelling. *Medline Plus Encyclopedia*, Swelling. http://www.nlm.nih.gov/medlineplus/ency/article/003103.htm.

Dr. Shaikh further reported that Mr. Helm did not regularly take his medication for diabetes mellitus (R. 151). Dr. Shaikh also reported that Mr. Helm has a history of uncontrolled hypertension and that he should go to Cook County Hospital immediately for medication (R. 151-52). Dr. Shaikh noted that Mr. Helm complained of fatigue but that he could not determine if the fatigue was due to sleep apnea without sleep studies (R. 152). Mr. Helm stated that he could not afford sleep studies because he did not have insurance (R. 321-22).

On August 4, 2004, Mr. Helm saw Dr. Runke, a physician with the Chicago Consulting Physicians (R. 158). Unlike Dr. Shaikh, Dr. Runke noted that Mr. Helm's gait was slow and cautious and that he limped with the left leg (R. 160). He also noted that Mr. Helm had decreased sensitivity and pulse in his legs (R. 163), and that he could not do a toe/heel squat (R. 160). Dr. Runke stated that Mr. Helm's hands, as well as his fine and gross motor skills, were normal (R. 164). In assessing his other life skills and abilities, Dr. Runke noted that Mr. Helm had a decreased ability of more than 50 percent for climbing, pushing, and pulling, and a 20-50 percent reduced capacity for walking, standing, and stooping (R. 164).

Through the latter part of 2004 and 2005, Mr. Helm continued to see Dr. Soofi and Dr. Birnbaum. On November 3, 2004, Dr. Birnbaum filled out a Medical Evaluation – Physicians Report. In this report, Dr. Birnbaum stated that Mr. Helm was diagnosed with metabolic syndrome, insulin dependent diabetes mellitus, hypertension, obesity and peripheral vascular disease (R. 146). Dr. Birnbaum reported that Mr. Helm had less than a fifty percent capacity for walking, bending, standing, stooping, sitting, turning, climbing, pushing, pulling, speaking, travel, fine manipulations, gross manipulations, finger dexterity and physical activities of daily life (R. 148). On April 14, 2005, Mr. Helm saw Dr. Soofi (R. 176). Dr. Soofi made a progress note that Mr. Helm needed more

insulin and that his blood pressure was still high (R. 176). On April 20, 2005, Mr. Helm saw Dr. Birnbaum and received a note from him stating: "This patient has uncontrollable metabolic syndrome including severe diabetic mellitus with PVD. He is totally disabled and requires access to medical care" (R. 247).

## C.

The administrative hearing was held on July 28, 2006. In addition to receiving testimony from Mr. Helm (which we have summarized as relevant above), the ALJ heard testimony from William Newman, a vocational expert ("VE").

The ALJ asked the VE what, if any, jobs a person could perform given the following hypothetical: an individual between the ages of 42 and 45, with a high school diploma, no college experience, who was unable to lift and carry more than twenty pounds occasionally and ten pounds frequently, unable to perform postural movement such as stooping, crouching, crawling and kneeling more than occasionally, unable to maintain sustained attention and concentration for any detailed or complex tasks. The VE testified that this hypothetical claimant would be unable to perform work as an assistant manager, but would be able to work as a vending machine attendant (R. 328). The ALJ then added the following restrictions to the above hypothetical: an inability to walk for more than two hours total in an eight-hour workday, probably not more than fifteen to twenty minutes at a time; an inability to lift and carry more than ten pounds occasionally or frequently; an inability to use ladders, scaffolding, and ropes, and the need to avoid situations where the loss of balance would be dangerous to the claimant or others; and a need to use a single assistive device to stand and work. The VE then testified that this hypothetical claimant would not work as a vending machine attendant, and would be limited to an assembly type position (R. 329-30). The VE continued by saying that,

in the State of Illinois, there are 65,494 assembly type positions (R. 330). The ALJ then added one additional restriction: an inability to perform fine manipulation. The VE testified that if the hypothetical claimant were unable to perform fine manipulation, then that person would not be able to work at all, even in the assembly type positions (R. 331).

## D.

We now summarize the ALJ's opinion. On the preliminary matters, the ALJ found that Mr. Helm was insured for purposes of Medicare entitlement due to government employees through December 31, 2008, but he did not meet the insured status requirements for the purpose of disability insurance benefits (R. 15). The ALJ also found that Mr. Helm had not engaged in substantial gainful activity since September 15, 2003, the alleged onset date (R. 15).

In assessing whether Mr. Helm had severe impairments, the ALJ found that Mr. Helm had insulin dependent diabetes mellitus, peripheral vascular disease,[9] obesity and hypertension. The ALJ expressly rejected Mr. Helm's claims of sleep apnea, a knee impairment, osteomyelitis, labile hypertension, and diabetic peripheral neuropathy.[10] The ALJ rejected the claim of sleep apnea, because Mr. Helm never had a sleep study conducted to make this diagnosis; the only evidence of this diagnosis in his chart was doctor's notes discussing the possibility of sleep apnea. The ALJ found that there was no medically determinable knee impairment, because the record shows no indication of Mr. Helm ever receiving treatment for a knee impairment. The ALJ rejected the claim

---

[9]Also known as arteriosclerosis of the extremities, it is a disease of the blood vessels characterized by narrowing and hardening of the arteries that supply the legs and feet. This causes a decrease in blood flow that can injure nerves and other tissues. MEDLINE PLUS ENCYCLOPEDIA, *Arteriosclerosis of the Extremities*, http://www.nlm.nih.gov/medlineplus/ency/article/000170.htm (visited April 3, 2004).

[10]Peripheral neuropathy is a problem with the nerves that carry information to and from the brain and spinal cord. This produces pain, loss of sensation, and inability to control muscles. MEDLINE PLUS ENCYCLOPEDIA, *Peripheral Neuropathy*, http://www.nlm.nih.gov/medlineplus/ency/article/000593.htm (visited April 3, 2004).

of osteomyelitis because Mr. Helm's experience with osteomyelitis that led to the amputation of the distal aspect of his left third toe occurred before the alleged disability onset date. The ALJ rejected Mr. Helm's claim of labile hypertension, because he found that the record supported a diagnosis of regular hypertension, not labile hypertension. Finally, the ALJ found that, "although the claimant asserts diabetic peripheral neuropathy, this condition does not impact upon his abilities to perform work-related activities" (R. 16).

Based on his step two determination, the ALJ found that the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In making this finding, the ALJ determined that Mr. Helm did not satisfy the medical conditions necessary to meet or equal a Listed Impairment in Section 9.08, diabetes mellitus, because Mr. Helm does not have neuropathy demonstrated by significant and persistent disorganization of motor functions in two extremities resulting in sustained disturbances in gross and dexterous movements, or gait and station (R. 17).

Prior to making findings at step four, the ALJ determined Mr. Helm's RFC. The ALJ found that Mr. Helm

> cannot stand/walk more than two hours total in an eight hour workday, not more than fifteen to twenty minutes at a time and requires a single assistive device; lift and carry more than ten pounds occasionally and lesser amounts more frequently; perform postural movements such as stooping, crouching, crawling, and kneeling more than occasionally; maintain sustained attention and concentration for any detailed or complex tasks; use ladders, scaffolding, ropes, or work at unprotected heights; and is restricted from situations where the loss of balance would be dangerous to the claimant and others

(R. 17). Based on these limitations, the ALJ determined that Mr. Helm was unable to perform any past relevant work (R. 19). However, the ALJ did find that "considering [Mr. Helm]'s age,

14

education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [he] can perform" (R. 20). Based on that determination, the ALJ found that Mr. Helm has not been under a "disability," as defined in the Social Security Act, from September 15, 2003 to the present (R. 21).

### III.

As his lead argument in support of reversal or remand, Mr. Helm argues that the ALJ erred by failing to include diabetic neuropathy in the list of severe impairments identified in the Step 2 analysis (Pl.'s Mem. at 10-11). Mr. Helm argues that this error also led the ALJ to err in his findings at Steps 3-5 (*Id.* at 11-15). And, Mr. Helm challenges the ALJ's findings as to Mr. Helm's credibility (*Id.* at 13-14). We address first Mr. Helm's step two argument, which we find dispositive.

### A.

At Step 2, a claimant bears the burden of showing that he or she has a severe impairment. The federal regulation governing the Step 2 analysis defines severe impairment in the negative: it states that an impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The regulations define "basic work activities" as "the abilities and aptitudes necessary to do most jobs, including: (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1521(b). Courts have interpreted this standard to impose a *de minimis* burden on a claimant to show that the impairment would have more than a minimal effect on his or her ability to do basic work activities. *Johnson v. Sullivan*, 922 F.2d 346, 347 (7th Cir. 1990) (citing *Bowen v. Yuckert*, 482 U.S. 137 (1989); *Brant v. Barnhart*, 506 F. Supp.2d 476, 481 (D. Kan. 2007). To meet this standard, a claimant must provide medical evidence

15

from acceptable medical sources, including licensed physicians, that he or she had a severe impairment. 20 C.F.R. §§ 404.1512(c), 416.912(c). If a claimant produces medical evidence to support the existence of an impairment, then an ALJ should reject the claim of a disability as severe "only if [the impairment] is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). Put another way, courts should only consider an impairment as not severe "if the medical evidence clearly establishes that an ailment or injury has a minimal or non-serious effect on the claimant's ability to perform work-related activities." *Lopez-Navarro v. Barnhart*, 207 F. Supp.2d 870, 881 (E.D. Wis. 2002).

Here, the medical evidence of record shows that Mr. Helm made the required showing that he has a diagnosis of neuropathy, and that the neuropathy affects his ability to perform basic work activities. Mr. Helm's medical records contain the reports of at least three doctors, other than his treater, who noted that Mr. Helm does suffer from neuropathy. For example, on July 22, 2004, Dr. Shaikh noted a history of neuropathy for Mr. Helm during a consultative examination (R. 151). Similarly, on August 4, 2004, Dr. Runke noted complaints of peripherial neuropathy by Mr. Helm during a consultative examination (R. 161). These reports are consistent with the EMG performed by Dr. Svetic in January 2001 that showed polyneuropathy and mononeuropathy (R. 226).

The record also disclosed evidence that this condition affects Mr. Helm's ability to perform work-related activities in more than a minimal way. Dr. Birnbaum, Mr. Helm's treating physician, reported that Mr. Helm has a reduced capacity in all work-related areas by greater than 50 percent (R. 148). Dr. Runke's assessment agreed that Mr. Helm had a reduced capacity for climbing, pulling, and pushing of more than 50 percent, and found that he was limited in walking, standing and stooping by 20-50 percent (R. 164). Dr. Runke observed that Mr. Helm's gait was slow and

cautious, that he had a limp in the left leg, and that he could not perform toe and heel squats (R. 160). Dr. Runke concluded that Mr. Helm suffered from a 20-50 percent reduction in capacity to perform the physical activities of daily living (R. 164). While Dr. Runke did not specifically attribute those limitations to any specific ailment afflicting Mr. Helm, the limitations are consistent with neuropathy.

The ALJ nonetheless found that any neuropathy Mr. Helm may suffer "does not impact upon his ability to perform basic work-related activities, and thus is not a severe impairment (R. 16). The ALJ stated that "the assessment by Dr. David Birnbaum, a treating source, in Exhibit 5F is expressly rejected" (R. 16). In support of that finding, the ALJ stated that the lack of objective evidence to support Dr. Birnbaum's assessment of Mr. Helm's limitations, when taken with the opinions of Dr. Shaikh and Dr. Runke, provide sufficient reason to reject the opinion at this step (R. 16). However, in finding a lack of objective evidence, the ALJ completely disregarded the EMG finding, suggesting that he did so because it had not been updated since 2001. But, the ALJ did not explain why, despite its vintage, the 2001 EMG did not support Dr. Birnbaum's opinion. In discussing Dr. Runke's report, the ALJ selectively focused only on the opinion that "the claimant had full capacity to perform find and gross manipulations" (R. 16-17), while completely failing to take into consideration Dr. Runke's opinion that Mr. Helm had a substantially reduced capacity for other work-related functions, such as walking, standing, stooping, climbing, pushing, pulling (R. 164).

As for Dr. Shaikh, the ALJ focused on the portion of his opinion that Mr. Helm displayed normal handwriting, arm strength, sensation and reflexes, and that he could make a fist, open his hands, and oppose all fingers to the thumb (R. 16). However, those findings do not rule out that Mr. Helm's neuropathy affected other work-related areas such as walking, standing, sitting, or the

other functions laid out in 20 C.F.R. § 404.1521(b)(1). Nor does the ALJ address the inconsistencies between Dr. Shaikh (who said Mr. Helm had a normal gait) (R. 151) and Dr. Runke (who said Mr. Helm limps and has a slow and cautious gait (R. 160).

For these reasons, we conclude that the record does not support the ALJ's stated rationale for finding at Step 2 that Mr. Helm did not suffer from the severe impairment of neuropathy. As we explain below, this error requires a remand, due to the possible effect of this erroneous Step 2 finding in other steps in the disability analysis.

### B.

Mr. Helm argues that the failure to include neuropathy in the list of disabilities at Step 2 tainted the ALJ's finding at Step 3. The Court agrees.

Step 3 requires the ALJ to determine if the claimant has an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.025 and 416.926). 20 C.F.R. Part 404, Subpart P, Appendix 1, 9.08 ("Listing 9.08") lists the disability of "diabetes mellitus, with (A) Neuropathy demonstrated by significant and persistent disorganization or motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station." At Step 3, the ALJ found that Mr. Helm's condition does not satisfy Listing 9.08, diabetes mellitus, because "the claimant does not have neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements or gait and station" (R. 17).

If the ALJ had included neuropathy in the list of Mr. Helm's severe impairments at Step 2, then to find that Mr. Helm's diabetes did not meet or equal Listing 9.08, the ALJ would have been

required to make a specific finding that Mr. Helm's neuropathy does not create a sustained disturbance of gross and dexterous movements or gait and station. However, because he dismissed neuropathy as a non-severe impairment at Step 2, the ALJ never made this determination, and never came to grips with the fact that both Dr. Birnbaum and Dr. Runke reported that Mr. Helm had a significantly reduced capacity to walk (and did so with a limp and in a labored way) and to engage in other related functions such as standing, stooping and climbing. The ALJ makes only the cursory and unexplained finding that Mr. Helm had no significant and persistent disorganization of motor function, including gait or station, by citing to Dr. Shaikh and to Dr. Runke (R. 17) – without acknowledging that their reports on this point are in conflict (*compare* R. 151 *and* R. 160, 164), and that Dr. Runke found that Mr. Helm limped and had significant limits in walking, standing, stopping and climbing. We think had the ALJ made the proper Step 2 finding, his analysis would have been more complete – and perhaps different – at Step 3.

C.

As a result of our conclusion that the ALJ error at Step 2 tainted his finding at Step 3, we need not and do not address the challenges raised by Mr. Helm to certain credibility findings and to the ALJ's findings at Step 4 and 5. We leave it to the ALJ to take evidence as may be necessary to further develop the record, and to make a fresh determination on the question of disability. We express no view as to the outcome of that determination.

19

## CONCLUSION

For the foregoing reasons, the Court denies the Commissioner's motion for summary judgment (doc. # 22) and grants Mr. Helm's motion for summary judgment (doc. # 20), remanding the case for the proceedings consistent with this decision.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: April 29, 2008**